**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 7, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

ST. FRANCIS HOSPITAL, INC.;
AHS HILLCREST MEDICAL
CENTER, LLC; ST. JOHN
MEDICAL CENTER,

     Plaintiffs - Appellants,

v.

XAVIER BECERRA,

     Defendant - Appellee.

No. 20-5097

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:19-CV-00170-GKF)**

_____

Daniel J. Hettich, King & Spalding LLP (Juliet M. McBride, with him on the briefs), Washington, D.C., for Plaintiffs-Appellants.

Kyle T. Edwards, Attorney, U.S. Department of Justice, Civil Division (Abby C. Wright, Attorney, U.S. Department of Justice, Civil Division; Brian M. Boynton, Acting Assistant Attorney General; Clinton J. Johnson, Acting United States Attorney; Daniel J. Barry, of Counsel, Acting General Counsel, U.S. Department of Health and Human Services; Janice L. Hoffman, of Counsel, Associate General Counsel, U.S. Department of Health and Human Services; Susan Maxson Lyons, of Counsel, Deputy Associate General Counsel for Litigation, U.S. Department of Health and Human Services; Jonathan C. Brumer, of Counsel, Attorney, Department of Health and Human Services, with her on the briefs), Washington, D.C., for Defendant-Appellee.

_____

Before **HOLMES**, **BALDOCK**, and **BACHARACH**, Circuit Judges.
_____

**BACHARACH**, Circuit Judge.
_____

In this appeal, three teaching hospitals[1] challenge the denial of Medicare reimbursements. These hospitals had shared the cost to train residents off-site (at places like community clinics). At that time, a teaching hospital could obtain reimbursement only by incurring "substantially all" of a resident's training costs. Omnibus Reconciliation Act of 1986, Pub. L. No. 99-509, § 9314, 100 Stat. 1874, 2005. Because the teaching hospitals had shared the training costs for each resident, the government denied reimbursement.

The denials led the teaching hospitals to file administrative appeals. While they were pending, Congress enacted the Affordable Care Act (ACA), which created a new standard for reimbursement. Under the new standard, teaching hospitals could obtain reimbursement on a proportional basis when they shared the training costs. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 5504(a)–(b), 124 Stat. 119, 659 (2010).

But the parties disagree on whether the ACA's new standard applied to proceedings reopened when Congress changed the law. The agency

_____

[1]     These teaching hospitals are St. John Medical Center, St. Francis Hospital, and Hillcrest Medical Center.

2

answered *no*, and the district court granted summary judgment to the agency. We affirm.

1.    **The court applies a deferential standard when reviewing administrative decisions.**

We conduct de novo review of the district court's ruling, applying the same standard that governed there. *See Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009) (review of summary-judgment ruling); *Via Christi Reg'l Med. Ctr., Inc. v. Leavitt*, 509 F.3d 1259, 1271 (10th Cir. 2007) (review under the Administrative Procedure Act), *abrogated on other grounds by Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019). The district court could set aside the administrative decision only if it was

- "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,"

- beyond the court's "statutory jurisdiction, authority, or limitations," or

- "short of statutory right."

5 U.S.C. § 706(2)(A), (C) (2018), *incorporated in* 42 U.S.C. § 1395oo(f)(1) (2018).

2.    **Prior to the ACA, federal law did not allow cost-sharing for shared residents engaged in off-site training.**

The teaching hospitals incurred the disputed costs from 2001 to 2006.[2] At that time, federal law covered reimbursement of costs for shared

---

[2]    One of the teaching hospitals (St. Francis Hospital) also incurred training costs in 2007. But in the teaching hospitals' opening brief, they

residents in nonhospital sites only "if *the hospital* [had] incur[red] all, or substantially all, of the costs for the training program in that setting." Omnibus Reconciliation Act of 1986, Pub. L. No. 99-509, § 9314, 100 Stat. 1874, 2005 (covering direct graduate medical education costs) (emphasis added); Balanced Budget Act of 1997, Pub. L. 105-33, § 4621(b)(2), 111 Stat. 251, 477 (covering indirect costs of medical education) (emphasis added). Because the noun *hospital* is singular, reimbursement was available only if a single hospital bore substantially all of the costs for the training program.

### A.     The teaching hospitals misapply the Dictionary Act to interpret the Medicare statutes.

The teaching hospitals argue that the Medicare statutes didn't prevent sharing of costs for residents training in community clinics. For this argument, the teaching hospitals rely on the Dictionary Act, an umbrella statute providing basic principles to interpret statutes. 1 U.S.C. § 1 (2000 & 2006). The Act states that "unless the context indicates

---

did not mention these costs. The agency thus argues that the teaching hospitals waived St. Francis Hospital's argument for reimbursement of its 2007 costs. In oral argument, the teaching hospitals disagreed, pointing out that the reimbursement issue for 2007 was identical to the issue involving costs incurred from 2001 to 2006. *Cf.* Joint App'x vol. II, at 331 ¶ 20 (stipulating in the administrative appeal that St. Francis Hospital's "two individual appeals . . . should be handled as appropriate if prior years are settled for the same [indirect medical education]/[graduate medical education] issue discussed herein"). We need not address the issue of waiver because we reject the teaching hospitals' claim for reimbursement of costs incurred from 2001 to 2006.

otherwise," "words importing the singular include and apply to several persons, parties, or things." *Id.* Interpreted in the plural, the statutes would allow reimbursement if hospital*s* "incur all, or substantially all, of the costs for the training program."

But the teaching hospitals misapply the Dictionary Act. This Act reflects "the common understanding that the English language does not always carefully differentiate between singular and plural word forms, and especially in the abstract, such as in legislation prescribing a general rule for future application." 2A Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction* § 47:34, at 505 (7th ed. rev. 2014); *see* Antonin Scalia & Bryan A. Garner, *Reading Law* 130 (2012);[3] *see also Cong. Globe*, 41st Cong., 3d Sess. 1474 (1871) (statement of Rep. Poland) (stating that the purpose of the Dictionary Act was "to avoid prolixity and

---

[3]    Justice Scalia and Mr. Garner explained:

[The Dictionary Act's provision for treating singular words as plural] is simply a matter of common sense and everyday linguistic experience: "It is a misdemeanor for any person to set off a rocket within the city limits without a written license from the fire marshal" does not exempt from penalty someone who sets off two rockets or a string of 100. If you cannot do one, you cannot do any, or many. The best drafting practice, in fact, is to use the singular number for just that reason: Each rocket unambiguously constitutes an offense.

Antonin Scalia & Bryan A. Garner, *Reading Law* 130 (2012).

tautology in drawing statutes and to prevent doubt and embarrassment in their construction").

Given this common-sense understanding, legislators often use singular nouns when creating rules applicable to every entity covered by the statute. *See, e.g.*, Bryan A. Garner, *Guidelines for Drafting and Editing Legislation* § 2.4, at 56 (2015) ("Draft in the singular number unless the sense is undeniably plural, as when the sentence refers to a habitual practice."); Ofc. of the Legislative Counsel, U.S. House of Representatives, *House Legislative Counsel's Manual on Drafting Style* 60–61 (1995) (advising use of the singular for clarity of expression). So Congress's use of a singular noun often sheds insight into the meaning.[4] For example, when Congress said that "the hospital" could obtain reimbursement if it had incurred substantially all of the training costs, the implication is clear: A hospital couldn't obtain reimbursement when sharing the costs with another entity.

---

[4]    The government observes that singular articles generally refer to only one item. Appellee's Resp. Br. at 22 (quoting *Banuelos v. Barr*, 953 F.3d 1176, 1181 (10th Cir. 2020)). For example, we've noted that the article *a* ordinarily "refers to only one item." *Banuelos*, 953 F.3d at 1181. This observation doesn't help here, though, because the statute uses the article *the*. This article can introduce either a singular or plural noun. *See* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 410 (2016) (stating that the article *the* "introduces both singular and plural nouns"). Here the noun is singular (*hospital*), so we focus on the noun rather than the accompanying article.

The Dictionary Act doesn't allow us to change the meaning by converting the singular noun *hospital* to a plural form (*hospitals*). To do so would distort Congress's meaning by authorizing reimbursement for hospital*s* banding together to share these costs.

Given the risk of distorting congressional intent, the Supreme Court stated in *United States v. Hayes* that courts are to construe singular items as plural only "[o]n the rare occasions" when "doing so [is] necessary to carry out the evident intent of the statute." 555 U.S. 415, 422 n.5 (2009) (internal quotation marks & citation omitted); *see also First Nat'l Bank in St. Louis v. Missouri ex rel. Barrett*, 263 U.S. 640, 657 (1924) (stating that the Dictionary Act's provision, treating singular terms as plural, "is not . . . to be applied except where it is necessary to carry out the evident intent of the statute").[5] Applying *Hayes*, we see no obvious signs of congressional intent to allow reimbursement of shared costs.[6] If Congress

---

[5]    The teaching hospitals point to *Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194 (1993). There the Court required compliance with the Dictionary Act's rules unless doing so would be "forcing a square peg into a round hole." *Id.* at 200. But *Rowland* was addressing the Dictionary Act's definition of the term "person," not characterization of a singular term as the plural. *See id.* at 199–200. *Rowland* didn't address the statutory use of singular terms.

[6]    The teaching hospitals observe that by enacting the statutes, Congress intended to encourage use of residents outside of hospitals. H.R. Rep. 99–727 (July 31, 1986), 1986 U.S.C.C.A.N. 3607, 3660. But Congress never suggested that this purpose would override any other considerations (such as cost).

had intended to allow reimbursement for hospital sharing costs, we'd expect the statutes to address the allocation of the reimbursement, the necessity of a written agreement, and the record-keeping requirements. But the Medicare statutes contained no such provisions from 2001 to 2006.[7]

The teaching hospitals also argue that *Hayes*, as a 2009 opinion, doesn't bear on Congress's intent when it enacted the statutes (1986 and 1997). But *Hayes* was interpreting the Dictionary Act, which underlies the teaching hospitals' argument. And when the Supreme Court interprets a statute, it is deciding what the statute has always meant. *See United States v. Rivera-Nevarez*, 418 F.3d 1104, 1107 (10th Cir. 2005) ("Decisions of statutory interpretation are fully retroactive because they do not change the law, but rather explain what the law has always meant.").[8] So the statutory

---

[7]    As discussed below, Congress enacted a new law in 2010, expressly allowing hospitals to share training costs. With that new law, Congress

- specified how the hospitals were to allocate the reimbursement,

- required a written agreement between the hospitals sharing the costs, and

- created record-keeping obligations.

Patient Protection and Affordable Care Act ("ACA") § 5504(a)–(b), 42 U.S.C. § 1395ww(h)(4)(E), (d)(5) (2012).

[8]    Though *Hayes* wasn't decided until 2009, the Supreme Court had said the same thing in 1924—over four decades before Congress enacted the pertinent Medicare provisions. *See First Nat'l Bank in St. Louis v. Missouri ex rel. Barrett*, 263 U.S. 640, 657 (1924) (stating that the Dictionary Act's provision, treating singular terms as plural, "is not . . . to

8

text in 1986 and 1997 allowed reimbursement only when a single hospital had incurred substantially all of a resident's training costs—not when two or more hospitals had shared these costs.

**B.     If the Medicare statutes from 2001 to 2006 were ambiguous, the agency's interpretation would have resolved the ambiguity by prohibiting reimbursement for shared costs.**

Despite the statutory reference to "the hospital" bearing the costs, let's assume the existence of an ambiguity in the statutory text. With that ambiguity, the court could consider whether the agency's statutory interpretation had been permissible. *Olmos v. Holder*, 780 F.3d 1313, 1317 (10th Cir. 2015). We call this "*Chevron* deference" based on *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984).

The agency interpreted the Medicare statutes in 1998 and 2003. Both times, the agency interpreted the Medicare statutes to allow reimbursement only when a single hospital bore substantially all of the training costs.

In 1998, the agency solicited comments and interpreted the statutes through a new rule. That rule allowed reimbursement to a hospital only if

---

be applied except where it is necessary to carry out the evident intent of the statute"). In this 1924 opinion, the Supreme Court was interpreting an earlier version of the Dictionary Act, which had created discretion to interpret singular terms as plural. *Compare id.* (quoting 1 Rev. Stat. § 1 (2d ed. 1878) ("[W]ords importing the singular number may extend and be applied to several persons or things.")), *with* 1 U.S.C. § 1 (2000 & 2006) ("[W]ords importing the singular include and apply to several persons, parties, or things.").

it had incurred substantially all of the training costs for the full complement of residents. 63 Fed. Reg. 40,954; 40,986 (July 31, 1998) ("[A] hospital may include the time a resident spends in nonprovider settings in its indirect medical education . . . and direct [graduate medical education] full-time equivalent count if it incurs 'all or substantially all' of the costs of training residents in the nonhospital site."). The rule clarified the prohibition against double-dipping by a hospital and other healthcare providers that shared residents. But the rule did not allow reimbursement when multiple entities shared the costs of a training program.

In 2003, the agency acted again, soliciting comments and interpreting the statutes through another new rule. This time, the rule limited reimbursement to a hospital assuming substantially all of the training costs for the full complement of residents: "A hospital is required to assume financial responsibility for the *full* complement of residents training in a nonhospital site in a particular program" and "cannot count any [full-time equivalent] residents if it incurs 'all or substantially all of the costs' for only a portion of the [full-time equivalent] residents in that program training setting." 68 Fed. Reg. 45,346; 45,439; 45,449–50 (Aug. 1, 2003) (final rule) (emphasis added). This rule again reflected an understanding

10

that reimbursement is allowed only when a single hospital bears substantially all of the costs for the training program.[9]

The teaching hospitals downplay this interpretation, arguing that the agency was trying to prevent gamesmanship among dental schools, which often shifted their training costs to hospitals in order to obtain reimbursement. This was indeed an impetus for the agency's interpretive process. 68 Fed. Reg. 27,154; 27,213 (May 19, 2003) (proposed rule). But the agency also noted that the problem went beyond dental schools. *Id.* And in explaining that dental schools couldn't obtain eligibility for reimbursement only by shifting the costs, the agency illustrated the rule

---

[9]    In 2007, the agency also adopted a rule prohibiting reimbursement when two or more hospitals shared the costs:

> [I]f two (or more) hospitals train residents in the same accredited program, and the residents rotate to the same nonhospital site(s), the hospitals cannot share the costs of that program at that nonhospital site . . . as we do not believe this is consistent with the statutory requirement at section 1886(h)(4)(E) of the Act which states that the hospital must incur "*all or substantially all, of the costs for the training program in that setting.*"

72 Fed. Reg. 26,870, 26,969 (May 11, 2007) (emphasis added). The teaching hospitals question the validity of the 2007 rule, arguing that the agency

- failed to provide notice and an opportunity to comment and

- incorrectly interpreted the statute.

We need not decide the validity of the 2007 rule: Even if the 2007 rule were invalid, the agency's interpretations in 1998 and 2003 would have clarified the statutory meaning.

with hypothetical situations that didn't involve dental schools. 68 Fed. Reg. 45,435. For example, the agency explained how the statute would treat a hospital that incurred the costs of new residents added to an existing program. 68 Fed. Reg. 45,439. In this situation, the agency explained that the statutory language allowed reimbursement of a hospital only if it had incurred substantially all of the costs for the entire training program:

> We note that, under existing policy, to count residents in a nonhospital setting, a hospital is required to incur for [sic] "all or substantially all of the costs of the *program*" in that setting. In other words, a hospital is required to assume financial responsibility for the *full* complement of residents training in a nonhospital site in a particular program in order to count any [full-time equivalent] residents training there for purposes of [indirect medical education] payment. . . . This policy is derived from the language of the [indirect medical education] and direct [graduate medical education] provisions of the statute on counting residents in nonhospital settings; both sections 1886(d)(5)(B)(iv) and 1886(h)(4)(E) of the Act state that the hospital must incur "all, or substantially all, of the costs for the training *program* in that setting.

*Id.* (emphasis added).

Granted, the agency was not focused on sharing of costs between hospitals. But the illustration would have prevented reimbursement when multiple hospitals had shared the training costs.

The agency's rules in 1998 and 2003 reflected reasonable interpretations of the statutes. These interpretations would thus help us interpret any conceivable ambiguity in the statutes. Coupled with the

statutory references to costs incurred by "the hospital"—a singular entity—the agency's statutory interpretations would clarify any ambiguity by preventing reimbursement when hospitals had shared the training costs.

### C.     The teaching hospitals can't rely on agency contractors' erroneous interpretation of the Medicare statutes.

Though the statutes didn't permit reimbursement, the teaching hospitals complain that agency contractors told them otherwise. The contractors' mistakes are unfortunate, but they didn't bind the agency. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 517 (1994) ("[T]he mere fact that . . . a fiscal intermediary may have allowed reimbursement to petitioner for [graduate medical education] costs that appear to have violated [a regulation] does not render the Secretary's interpretation of that [regulation] invalid."); *Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.*, 467 U.S. 51, 63–64 (1984) (stating that the agency isn't bound by a contractor's erroneous advice).

Recognizing that these statements weren't binding, the teaching hospitals argue that the contractors' mistakes reflect a lack of fair notice involving the agency's interpretation. But the statutes themselves supplied the required notice. "[T]hose who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Heckler*, 467 U.S. at 63; *see Cmty. Health Sys., Inc. v. Burwell*, 113 F. Supp. 3d 197, 233 (D.D.C. 2015) ("While the plaintiffs

13

have supplied evidence of confusion by some intermediaries and an accountant in a Medicare component seventeen years ago, this does not prove lack of fair notice to the plaintiffs of the agency's policy.").

We thus conclude that the teaching hospitals couldn't obtain reimbursement based on the contractors' erroneous statements.

* * *

Together, the statutory language and the agency's interpretation limited reimbursement to a single hospital bearing substantially all of the costs of the training program. So when the three teaching hospitals shared the training costs, the Medicare statutes would not have permitted reimbursement.

**3.    The ACA expanded reimbursement only for future costs, not those already incurred.**

The ACA changed the law in 2010, allowing reimbursement when hospitals share the residents' costs. Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 5504(a)–(b), 124 Stat. 119, 659 (2010) (codified at 42 U.S.C. § 1395ww) (2012)). Going forward, teaching hospitals could obtain reimbursement on a proportional basis. 42 U.S.C. § 1395ww(d)(5)(B)(II), § 1395ww(h)(4)(E)(ii) (2012). But the ACA stated that the change would be "effective [only] for [discharges or cost-reporting periods] on or after July 1, 2010." 42 U.S.C. § 1395ww(h)(4)(E)(ii), § 1395ww(d)(5)(B)(iv)(II) (2012). Given this change, the parties disagree

14

on the applicability of the new reimbursement standards to training costs incurred prior to July 1, 2010. We conclude that the new reimbursement standards do not apply to those costs.

### A. We presume that the new reimbursement standards don't apply to costs preceding enactment of the ACA.

We ordinarily presume that new laws don't apply retroactively. *Landgraf v. USI Film Prods.*, 511 U.S. 244, 278–80 (1994). To determine the applicability of the presumption, we apply two steps:

1. We first ask whether Congress expressly addressed retroactive application. *Id.* at 280.

2. If not, we consider whether application of the law would affect someone's substantive rights, duties, or liabilities based on conduct that had preceded the statutory enactment. *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006).

If we answer *yes* to the second question, we "apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question owing to the 'absence of a clear indication from Congress that it intended such a result.'" *Id.* at 37–38 (cleaned up) (quoting *INS v. St. Cyr*, 533 U.S. 289, 316 (2001), *superseded by statute on other grounds by* REAL ID Act of 2005, 8 U.S.C. § 1252(a)(4)–(5)) (2006)).

### B. First Step: The ACA did not expressly provide for retroactive application of the new reimbursement standards.

At the first step, we consider congressional intent based on the ACA's text. To determine Congress's intent, we consider the ACA's language. *See In re John Q. Hammons Fall 2006, LLC*, 15 F.4th 1011, 1019

15

(10th Cir. 2021) (stating that we first "employ ordinary statutory-interpretation tools 'to determine whether Congress has expressly prescribed the statute's proper reach.'" (quoting *Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994))). The ACA's text doesn't expressly apply the new reimbursement standards to previous costs.[10]

> ### i. Section 5504(a) and (b) states that reimbursement for past costs reports would be governed by the *prior* reimbursement standards.

In § 5504 of the ACA, subsections (a) and (b) state that the new reimbursement standards apply only to discharges or cost reports on or after July 1, 2010—not before. ACA § 5504(a)–(b), 42 U.S.C. § 1395ww(h)(4)(E)(ii), § 1395ww(d)(5)(B)(iv)(II) (2012). Going forward, hospitals could claim reimbursements proportional to their own costs. *Id.*

Subsections (a) and (b) also address the standard governing costs that had preceded the ACA. For those costs, Congress incorporated the prior statutory language, allowing a hospital to count time spent in outpatient settings only "if the hospital [had] incur[red] all, or substantially all, of the costs for the training program in that setting." ACA § 5504(a), 42 U.S.C. § 1395ww(h)(4)(E)(i) (2012); ACA § 5504(b), 42 U.S.C. § 1395ww(d)(5)(B)(iv)(I) (2012).

---

[10]    The agency goes further, arguing that the ACA expressly prohibits retroactive application of the new reimbursement standards. We need not address this argument.

16

### ii. Section 5504(c) does not expressly or necessarily make the new reimbursement standards retroactive.

Despite these express statements of *prospective* application, the teaching hospitals argue that Subsection (c) made the new reimbursement standards *retroactive*. But Subsection (c) does not say anything about retroactivity or application of the new reimbursement standards to past costs.

Congress knew how to make the ACA's new provisions retroactive. An example appears in § 5505, where Congress amended the reimbursement provisions for residents' time in scholarly and didactic activities. ACA § 5505, 124 Stat. at 660 (codified at 42 U.S.C. § 1395ww (2012)). For these provisions, Congress expressly mandated retroactive application of these changes to cost-reporting periods beginning on or after January 1, 1983. ACA § 5505(c)(1), 42 U.S.C. § 1395ww note (2012). Another example appears in § 5506, where Congress amended the reimbursement provisions for residents' slots upon the closing of a hospital. ACA § 5506, 124 Stat. at 661 (codified at 42 U.S.C. § 1395ww) (2012). There Congress again specified retroactivity, requiring the agency to establish a process for increasing the limit on residents at other hospitals when a hospital had closed in the last two years. ACA § 5506(a), 42 U.S.C. § 1395ww(h)(4)(H)(vi) (2012).

17

But Congress said nothing like that when addressing the new reimbursement standards. The difference suggests that Congress may not have intended retroactive application of the new reimbursement standards. *See Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1350 (Fed. Cir. 2015) (concluding that retroactive application isn't implied when the statute contained other provisions expressly providing retroactive effect).

Given the absence of any express provision calling for retroactive application of the new reimbursement standards, the teaching hospitals rely on an implication from § 5504(c). This implication suffices only if retroactive construction is "necessary." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (quoting *United States v. St. Louis, S.F. & Tex. Ry.*, 270 U.S. 1, 3 (1926)). And such construction is necessary only if the implication of retroactivity were "so clear that it could sustain only one interpretation." *INS v. St. Cyr*, 533 U.S. 289, 316–17 (2001), *superseded by statute on other grounds by* REAL ID Act of 2005, 8 U.S.C. § 1252(a)(4)–(5) (2006).

Subsection (c) does not necessarily imply retroactive application of the new reimbursement standards. The teaching hospitals' contrary argument stems from the subsection's double negative, which says that the new law would *not* be applied when there *wasn't* a proper appeal pending

18

as of July 1, 2010. ACA § 5504(c), 124 Stat. at 660, 42 U.S.C. § 1395ww note (2012). From this double negative, the teaching hospitals argue that

- reopening was mandatory when there was a properly perfected appeal pending as of July 1, 2010, and

- the new reimbursement standards applied in these reopened proceedings.

As the teaching hospitals argue, the double negative could conceivably be read to require reopening of cost reports when jurisdictionally-proper appeals—including theirs—were pending as of July 1, 2010. But this interpretation is at least debatable because Congress might have intended to preserve the discretionary nature of reopenings.

In Subsection (c), Congress said that § 5504 doesn't require reopening unless there's a proper appeal. The teaching hospitals analogize this language to a sign in a bar stating, "No liquor sold to those under 21." With this analogy, the teaching hospitals argue that most people would interpret this sign to mean that liquor would be sold to those over 21.

But context matters. In the bar example, the teaching hospitals' implication comes from a background assumption: Bars sell liquor, so anyone would assume that the bar would sell the liquor to someone. If the bar wouldn't sell to someone under 21, patrons could safely assume that the bar would sell to individuals 21 or over.

The background assumptions here are different because reopenings have long been considered discretionary. *Your Home Visiting Nurse Servs.,*

19

*Inc. v. Shalala*, 525 U.S. 449, 457 (1999). The reimbursement context, then, more clearly resembles a context where everyone in a bar understands that bartenders can decide who to serve. With that understanding, patrons might assume that a bartender could refuse to sell liquor even to the elderly.

The teaching hospitals' argument relies not only on background assumptions, but also on the fallacy of drawing a positive inference from a negative statement. Consider this example from the district court's opinion: "Because it's not cold outside, it's not snowing. It is now cold outside, therefore it must be snowing." Joint App'x vol. II, at 277 (citing *Ace Fire Underwriters Ins. Co. v. Romero*, 831 F.3d 1285, 1291 n.7 (10th Cir. 2016)). We know that cold air doesn't always bring snow, so there's something wrong with the logic of this sentence pair. The error consists of drawing a positive inference from a negative statement. Here too, the teaching hospitals err by drawing a positive inference from a negative statement: We know that reopening isn't required in the absence of a proper appeal. But that doesn't mean that when there's a proper appeal, reopening is required.

Finally, the teaching hospitals argue that the agency interpreted nearly identical statutory language in §§ 5505(d) and 5506(c) to require reopening when the claimant had an administrative appeal pending upon enactment of the ACA. This isn't true of the agency's interpretation of

20

§ 5505(d): "This provision *may not be applied* in a manner that would require the reopening of settled cost reports, *except* those cost reports on which, as of March 23, 2010, there is a jurisdictionally proper appeal pending on direct [graduate medical education] or [indirect medical education] payments." 42 C.F.R. § 412.105(f)(1)(iii)(C) (emphasis added).

Under the teaching hospitals' theory, the term *except* in § 5505(d) creates a double negative, making the first clause positive. So the teaching hospitals would treat the regulatory interpretation to require reopening where there is a jurisdictionally proper appeal. But stated positively, this provision would say that it *may* "be applied in a manner that would require the reopening of settled cost reports" when there's a jurisdictionally proper appeal pending as of March 23, 2010. The agency's interpretation of § 5505(d) thus suggests that reopening is discretionary, not automatic. *See* Ofc. of the Legislative Counsel, U.S. Senate, *Legislative Drafting Manual*, § 315(a), at 76 (1997) ("Use 'may' . . . to grant a right, privilege, or power.").

Though the teaching hospitals argue that § 5504(c) requires reopening of the cost reports underlying their administrative appeal, the teaching hospitals could prevail here only if the new reimbursement standards were to apply in the reopened proceedings. In our view, however, application of the new reimbursement standards would contradict the statutory language addressing the effective dates (subsections (a) and (b)).

*See* pp. 14–16, above. The teaching hospitals disagree, arguing that Subsection (c) just qualifies the effective dates in subsections (a) and (b) by providing an exception to the general rule that the new reimbursement standards apply to discharges and cost-reporting periods starting on or after July 1, 2010. But Subsection (c) doesn't say anything about effective dates.

Congress included an effective date in subsections (a) and (b) and could easily have done so in Subsection (c). And when Congress wanted to make parts of the ACA retroactive, Congress made the retroactivity explicit. ACA § 5505(c), 42 U.S.C. § 1395ww note (2012); *see* p. 17, above. But Subsection (c) is silent on retroactivity. That silence arguably implies "that Congress did *not* want the Act's reimbursement rules to be retroactive." *Covenant Med. Ctr., Inc. v. Burwell*, 603 Fed. App'x 360, 364 (6th Cir. 2015) (unpublished) (emphasis in original). At a minimum, however, Subsection (c) didn't expressly or necessarily mandate retroactive application of the new reimbursement standards.

To interpret Subsection (c) as an exception to the rule stated in subsections (a) and (b), the teaching hospitals rely on a book by Justice Antonin Scalia and Mr. Bryan Garner, which states that courts can sometimes synthesize contradictory provisions by treating one provision as a specific exception to a general rule. Appellant's Opening Br. at 31 (discussing Antonin Scalia & Bryan A. Garner, *Reading Law* § 28, at 183

(2012)). But the court can synthesize the provisions this way only when they'd otherwise clash. *Id.*; *see United States v. Henry*, 1 F.4th 1315, 1325 (11th Cir. 2021) ("The general/specific canon only applies when 'the attribution of no permissible meaning can eliminate the conflict.'") (quoting Antonin Scalia & Bryan Garner, *Reading Law* § 28, at 183 (2012)).

And we can easily synthesize Subsection (c) with subsections (a) and (b). Subsections (a) and (b) provide both the general rule and the exception regarding the new reimbursement standards: The general rule authorizes future application of the new reimbursement standards, and the exception prohibits application of these standards to past discharges and cost-reporting periods. Subsection (c) addresses the separate issue of reopenings.

Despite the distinction between these issues, the teaching hospitals argue that the new reimbursement standards would presumably apply to reopenings because they would otherwise be futile. This is true for the three teaching hospitals' administrative appeals, but may not be true for many other disputes over reimbursement.

In a proceeding reopened under Subsection (c), the underlying standard would depend on the claim. As noted above, the ACA not only allowed reimbursement for hospitals sharing costs, but also loosened the restrictions on reimbursement for residents' time in scholarly and didactic

activities. ACA § 5505(a), 124 Stat. at 660 (codified at 42 U.S.C. § 1395ww (2012)); *see* p. 17, above. So a reopening could allow a hospital to take advantage of the new reimbursement standards for scholarly and didactic activities.[11]

At the first step, we thus conclude that Congress did not expressly or necessarily make the new reimbursement standards retroactive.

## C.    Second Step: Application of the new reimbursement standards would retrospectively affect the government's rights.

Because Subsection (c) didn't expressly or necessarily mandate retroactive application, we consider whether application of the new reimbursement standards would increase the government's liability for reimbursement of earlier costs. *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994). Prior to passage of the ACA, the government had no obligation to reimburse the teaching hospitals for costs incurred between 2001 and 2006. *See* Part 2, above. If we were to apply the ACA's new reimbursement standards, the government would incur a new obligation

---

[11]    The teaching hospitals argue that the agency has admitted that Congress wouldn't have required reopening only to apply the same single-hospital requirement that had existed previously. This argument misinterprets what the agency said. It said that reopening isn't required and that even if it were, Subsection (c) had said nothing about the substantive standard. As the agency pointed out, that standard will vary from case to case, depending on the nature of the administrative appeal.

24

that hadn't existed earlier. So on its face, application of the new reimbursement standards would create a new governmental liability.

The teaching hospitals downplay the effect of this new governmental liability, arguing that

- the government incurs no harm by paying hospitals for using residents and

- the presumption doesn't apply here because the retrospective burden would fall on the government rather than a private party.

But the presumption against retroactivity applies even when

- the burden falls on the government and

- the governmental burden involves Medicare reimbursement.

*See Edwards v. Lujan*, 40 F.3d 1152, 1154 n.1 (10th Cir. 1994) (applying this presumption to prevent retroactive application of a provision that would require the government to pay interest on awards); *see also Landgraf v. USI Film Prods.*, 511 U.S. 244, 271 n.25 (1994) ("While the great majority of [Supreme Court] decisions relying on the antiretroactivity presumption have involved . . . burden[s on] private parties, [the Supreme Court has] applied the presumption in cases involving new monetary obligations that fell only on the government."); *United States v. Magnolia Petroleum Co.*, 276 U.S. 160, 162–63 (1928) (applying the presumption to prohibit retroactive application of a new rule increasing the amounts of tax refunds); *Yale-New Haven Hosp. v. Leavitt*, 470 F.3d 71, 87 n.16 (2d Cir.

25

2006) (applying the presumption to a Medicare regulation when the payment obligation would fall on the government); *Harrod v. Glickman*, 206 F.3d 783, 791–92 (8th Cir. 2000) (applying the presumption to protect the government's preexisting right to reimbursement for erroneous payments). So the presumption against retroactivity applies, prohibiting application of the new reimbursement standards. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37–38 (2006) (prohibiting retroactive application of a statute in the absence of a clear congressional intent to make the law retroactive). The ACA thus did not create a new right to reimbursement for costs incurred from 2001 to 2006.

**4.    The teaching hospitals can't obtain relief based on the 2010 administrative regulations.**

Though the new statutory reimbursement standards can't be applied here, the teaching hospitals rely in the alternative on the agency's own regulations. The agency adopted two regulations: one in 2010 and another in 2014. The teaching hospitals rely on the 2010 regulation, stating that it authorized reimbursement for shared costs.[12] We reject this argument: The 2010 regulation was either superseded by the 2014 regulation or could not retroactively apply to costs incurred from 2001 to 2006.

---

[12]    The parties clash on the validity and meaning of the 2010 interpretation. We need not resolve that clash.

26

First, the 2014 regulation automatically superseded the agency's interpretation in 2010. *See Vawter v. Comm'r of Internal Rev.*, 83 F.2d 11, 14 (10th Cir. 1936) (stating that a newer regulation supersedes the older version "under familiar rules of construction . . . in respect of any conflict between them"). The 2014 regulation clarified that "[c]ost reporting periods beginning before July 1, 2010" were "not governed" by the new reimbursement standards. 42 C.F.R. § 413.78(g)(6) (2014).

Given the content of the 2014 regulations, the teaching hospitals argue that application of these regulations would violate another provision in the Medicare statute, which limited retroactive application of substantive changes. In the hospitals' view, the 2014 regulations substantively changed the 2010 regulations. Given that substantive change, the teaching hospitals argue, we would need to apply the 2010 regulation.[13]

The teaching hospitals' argument doesn't follow because any application of the 2010 regulation would itself constitute a retroactive application of a substantive change. The teaching hospitals had incurred

---

[13]　Retroactive application of the 2014 regulation would be permissible if the agency determined that retroactive application was necessary to comply with a statute or to promote the public interest. 42 U.S.C. § 1395hh(e)(1) (2012). When adopting the 2014 regulation, the agency explained that it was amending the language to carry out the language of the Affordable Care Act's restriction on applicability prior to July 1, 2010. 79 Fed. Reg. 50,119 (2014). We need not decide whether the agency's explanation constitutes a determination of the need for retroactive application to comply with the statute or to promote the public interest.

27

the costs from 2001 to 2006—years before the agency adopted the 2010 regulation. And the 2010 regulation, as interpreted by the teaching hospitals, would substantively change the prior statutory standard for reimbursement. *See* Part 2(A)–(B), above. So if the 2014 regulation couldn't retroactively apply, neither could the 2010 regulation.[14]

Only two possibilities exist:

1.    A court couldn't retroactively apply the regulations from either 2010 or 2014 or

2.    the 2010 regulation was valid, but superseded by the 2014 version.

Either way, the teaching hospitals couldn't rely on the 2010 regulation.[15] As a result, the 2010 regulation couldn't support reimbursement for the costs incurred from 2001 to 2006.

---

[14]    Federal law similarly forbids retroactive application of the 2010 regulation unless the agency expressly found a need to retroactively apply the regulation for the public interest or to comply with statutory requirements. 42 U.S.C. § 1395hh(e)(1) (2012); *see* p. 27 n.13, above. But the teaching hospitals don't argue that

- the agency made either of those findings or

- another statute mandated retroactive application.

[15]    The agency goes further, arguing that we should apply *Chevron* deference to the agency's view that the ACA's new reimbursement standards weren't retroactive. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984). We need not address the applicability of *Chevron* deference because any potential ambiguity is resolved through the presumption against retroactivity. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1630 (2018) (noting that courts apply *Chevron* deference only as a necessary tool when other "traditional tools of

**5.    Conclusion**

When the teaching hospitals incurred the training costs, the Medicare statutes didn't permit reimbursement for shared costs. Although the ACA later softened these restrictions, the new reimbursement standards don't apply retroactively to costs incurred years earlier. We thus conclude that the teaching hospitals are not entitled to reimbursement for their shared costs in training residents from 2001 to 2006. Given this conclusion, we affirm the district court's award of summary judgment to the agency.

---

statutory construction" fail to resolve an ambiguity) (internal citations & quotations omitted); *see also INS v. St. Cyr*, 533 U.S. 289, 320 n.45 (2001) (citation omitted) ("Because a statute that is ambiguous with respect to retroactive application is construed under our precedent to be unambiguously prospective, there is, for *Chevron* purposes, no ambiguity in such a statute for an agency to resolve."), *superseded by statute on other grounds by* REAL ID Act of 2005, 8 U.S.C. § 1252(a)(4)–(5) (2006).

No. 20-5097, *St. Francis Hospital v. Becerra*
**BALDOCK**, J., concurring

The outcome the Court reaches in this case is correct. I write separately merely to present a differing view on statutory analysis from the one presented in the majority opinion. To some, these differences may appear semantic. But law demands precision, and our duty as a Court is to provide clarity while adhering to "our usual, prudent practice of not reaching out to decide unnecessary issues." *Soc'y of Prof'l Journalists v. Sec'y of Labor*, 832 F.2d 1180, 1186 (10th Cir. 1987) (Seymour, J., concurring). These principles guide my approach to this case.

The first step in resolving any question of statutory interpretation is to look at the text of the statute. *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2003); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." (citations omitted)). "It is well established that 'when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms.'" *Lamie*, 540 U.S. at 534 (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)). Of that, the majority and I are in complete agreement. We diverge, however, on how to approach this threshold question and what its implications are with respect to the specific statutes at issue here. The fundamental question in this case is whether the statutory provisions before us are ambiguous or not. *See Robinson*, 519 U.S. at 340 ("Our first step in interpreting a statute is to determine whether the language at issue

has a plain and unambiguous meaning with regard to the particular dispute in the case."); *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 280 (1994). The Supreme Court has provided clear guidance to help us answer that question. "The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341 (citations omitted). When we follow these instructions, we can reach the correct result in this case in a more straightforward manner than the circuitous path laid out in the majority opinion.

Let us begin with the statutes governing reimbursement before Congress passed the Affordable Care Act, the Omnibus Reconciliation Act of 1986, Pub. L. No. 99-509, § 9314, 100 Stat. 1874, 2005 and the Balanced Budget Act of 1997, Pub. L. 105-33, § 4621(b)(2), 111 Stat. 251, 477: The majority opinion correctly concludes that the singular language in these provisions precluded the Hospitals from recovering the funds they sought for off-site training because both statutes contain the language "if the *hospital* incurs all, or substantially all, of the costs for the training program in that setting." *Id.* (emphasis added).

The plain language of these provisions, then, does not contemplate multiple hospitals sharing the costs of the training. Having looked at the "language itself," we next consider the "specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. The specific context of the language limits the availability of the funds the Hospitals seek through direct reference. The broader statutory context includes the Dictionary Act because that provision, by its own terms, applies to "the meaning of any Act of Congress, unless the context indicates otherwise." 1

2

U.S.C. § 1. The majority correctly concludes the Dictionary Act does not modify the statutes at issue to entitle the Hospitals to relief. Based on the guidance from the Supreme Court, then, the statutes are unambiguous, and the Hospitals cannot claim reimbursement under the pre-ACA standard. Nevertheless, in Section 2.B of its opinion, the majority "assume[s] the existence of an ambiguity in the statutory text" so that it can address agency regulations through the lens of *Chevron* deference. Op. at 9–13. We do not need to create an ambiguity where none exists. Accordingly, "that portion of the Court's opinion [is] pure dictum because it is entirely unnecessary to an explanation of the Court's decision." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 121 (1998) (Stevens, J., concurring).

Next, let us proceed to the second set of statutes at issue, the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, §§ 5504(a)–(c), 124 Stat. 119, 659 (2010). Sections 5504(a) and 5504(b) established a new standard that enables the Hospitals to recover costs for shared off-site training. Unfortunately for the Hospitals, however, § 5504(a) and § 5504(b) are clearly and unambiguously prospective because Congress expressly limited their application to "cost reporting periods *beginning on or after July 1, 2010*" and "discharges *occurring on or after July 1, 2010*." This language means that, by definition, the provisions have no retroactive effect and afford the Hospitals no relief. Nevertheless, in an attempt to circumvent this obstacle, the Hospitals argue another provision, § 5504(c), modifies those provisions because, according to them, it requires the agency to reopen their cost reports and it would be futile to mandate reopening only to apply the pre-ACA standard. The majority analyzes this argument in terms of the presumption against retroactivity.

3

The first question when considering the application of the presumption against retroactivity is "whether Congress has expressly prescribed the statute's proper reach." *Landgraf*, 511 U.S. at 280. In other words, is the statute ambiguous as to its retroactive application? The majority rightly begins its analysis on this question by looking to the statute's language. The majority, however, rejects the Government's argument "that the ACA expressly prohibits retroactive application of the new reimbursement standards" by declining to address it. Op. at 16 n.10. The majority's approach is misguided.

As previously noted, the Supreme Court has instructed us to consider both the language and the context of the statute when we address questions of statutory ambiguity. *Robinson*, 519 U.S. at 341. The best way to do that is to reproduce the language of the provision at issue. Section 5504(c) states the following:

> Application.—The amendments made by this section shall not be applied in a manner that requires reopening of any settled hospital cost reports as to which there is not a jurisdictionally proper appeal pending as of the date of the enactment of this Act on the issue of payment for indirect costs of medical education under section 1886(d)(5)(B) of the Social Security Act (42 U.S.C. 1395ww(d)(5)(B)) or for direct graduate medical education costs under section 1886(h) of such Act (42 U.S.C. 1395ww(h)).

Beginning with the language of the statute: The Hospitals believe § 5504(c)'s use of the phrase "shall not be applied in a manner that requires reopening of any settled hospital cost reports as to which there is not a jurisdictionally proper appeal pending as of the date of the enactment of this Act" requires the agency to reopen cost reports if they were the subject of a "jurisdictionally proper appeal" on that date. *See* Applts.' Br. at 20 (quoting § 5504(c)). They support this argument by presenting several hypotheticals, one of which

4

is that a sign outside a liquor store reading "No alcoholic beverages sold to those under 21" means the liquor store must sell alcohol to someone over 21. *See id.* at 20–21, 26. As the majority correctly notes, this is a logical fallacy. The negative implication of the sign is that the liquor store *may* sell liquor to someone over 21—it is a reservation of discretion. Likewise, the language of § 5504(c) does not require the agency to reopen cost reports if they were subject to "jurisdictionally proper appeal[s]" on the day Congress passed the ACA. Quite the opposite is true. The correct reading of § 5504(c) is as a limitation on the agency's ability to interpret the provisions of the ACA. Section 5504(c) states "[t]he amendments made by this section shall not be applied in a manner that requires reopening of any settled hospital cost reports as to which there is not a jurisdictionally proper appeal pending." The meaning of this provision is clear—if a cost report was not subject to a jurisdictionally proper appeal on the specified date, the agency has no discretion to reopen it. If, however, a proper appeal was pending, the agency may still exercise its inherent discretionary authority to reopen those cost reports. *Cf.* 42 C.F.R. § 405.1885(c). The plain meaning of the statute, then, is that it serves as a limitation on agency discretion. This provision in no way suggests, implies, or requires the retroactive application of § 5504(a) or § 5504(b).

Next, to consider the context of § 5504(c), we must look to the other provisions of § 5504, namely § 5504(a) and § 5504(b). These provisions, as previously noted, expressly apply prospectively. Reading § 5504(c) as a limitation on agency discretion in the context of these provisions, it is clear no ambiguity appears on the question of retroactive application. None of these provisions apply retroactively, and there is no reasonable way

5

to construe them to do so.  The fact that § 5504(c) is poorly worded does not make its meaning ambiguous.  Likewise, the fact that a party presents a weak argument does not mean we should hesitate in dismissing it.  Accordingly, the majority opinion should have ended its analysis on the first question under the presumption against retroactivity and concluded, as the Government suggested, that the language of § 5504 precludes retroactive application.  By failing to do so, the majority strayed from "our usual, prudent practice of not reaching out to decide unnecessary issues."  *Soc'y of Prof'l Journalists*, 832 F.2d at 1186 (Seymour, J., concurring).  I respectfully concur except as to parts 2.B, 3.B.2, and 3.C of the majority opinion.